*Decisions will be entered under Rule 50.*

W. K. Co. AND ITS WHOLLY OWNED SUBSIDIARY—PUBLIC TAXI SERVICE, INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4658–69–4664–69.   Filed May 27, 1971.

---

[1] Cases of the following petitioners are consolidated herewith: Courteous Cab Co., docket No. 4659–69; Courteous Cab Co., successor by merger to Gemini Cab Co., docket No. 4660–69; Courteous Cab Co., successor by merger to Four Star Cab Co., docket No. 4661–69; Courteous Cab Co., successor by merger to Venus Cab Corp., docket No. 4662–69; Courteous Cab Co., successor by merger to Jupiter Cab Corp., docket No. 4663–69; and Courteous Cab Co., successor by merger to Leo Cab Co., docket No. 4664–69.

*Warren E. King*, for the petitioners.
*Lewis M. Porter, Jr.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined the following income tax deficiencies in these consolidated cases:

| Petitioners | Docket No. | Taxable year ended | Deficiency |
|---|---|---|---|
| W. K. Co. and its wholly owned Subsidiary—Public Taxi Service, Inc. | 4658-69 | 9/30/64 9/30/65 9/30/66 | $3,725.31 10,583.22 24,494.52 |
| Courteous Cab Co. | 4659-69 | 6/30/66 | 1,983.84 |
| Courteous Cab Co., successor by merger to Gemini Cab Co. | 4660-69 | 7/31/64 7/31/65 7/31/66 | 142.19 893.73 1,501.92 |
| Courteous Cab Co., successor by merger to Four Star Cab Co. | 4661-69 | 6/30/64 6/30/65 6/30/66 | 18.41 103.33 100.96 |
| Courteous Cab Co., successor by merger to Venus Cab Corp. | 4662-69 | 9/30/64 9/30/65 9/30/66 | 457.77 592.23 586.00 |
| Courteous Cab Co., successor by merger to Jupiter Cab Corp. | 4663-69 | 7/31/64 7/31/65 7/31/66 | 155.98 659.79 152.00 |
| Courteous Cab Co., successor by merger to Leo Cab Co. | 4664-69 | 9/30/64 9/30/65 9/30/66 | 95.50 471.94 1,174.08 |

The sole issue presented for our resolution is whether petitioners are entitled to amortize certain taxicab licenses or whether such licenses cannot be amortized because they have indeterminate useful lives.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference.

Petitioners, W. K. Co. and its wholly owned subsidiary, Public Taxi Service, Inc., are corporations organized and doing business under the laws of the State of Illinois and at the time they filed their petition herein their principal office was located at Chicago, Ill. Both corporations filed consolidated corporate income tax returns (Form 1120) for the taxable years ended September 30, 1964, September 30, 1965, and September 30, 1966, with the district director of internal revenue at Chicago, Ill.

Petitioner, Courteous Cab Co., is a corporation organized and doing business under the laws of the State of Illinois and at the time it filed its petition herein its principal office was located at Chicago, Ill. Its corporate income tax return (Form 1120) for the taxable year ended June 30, 1966, was filed with the district director of internal revenue at Chicago, Ill.

Courteous Cab Co. is also the successor by merger dated January 13, 1969, to Gemini Cab Co., Four Star Cab Co., Venus Cab Corp., Jupiter Cab Corp., and Leo Cab Co. At the time petitioner filed its petitions herein with respect to Gemini Cab Co. (docket No. 4660–69), Four

Star Cab Co. (docket No. 4661–69), Venus Cab Corp. (docket No. 4662–69), Jupiter Cab Corp. (docket No. 4663–69), and Leo Cab Co. (docket No. 4664–69), its principal office was located at Chicago, Ill.

Gemini Cab Co. filed corporate income tax returns (Form 1120) for its taxable years ended July 31, 1964, July 31, 1965, and July 31, 1966, with the district director of internal revenue at Chicago, Ill.

Four Star Cab Co. filed corporate income tax returns (Form 1120) for its taxable years ended June 30, 1964, June 30, 1965, and June 30, 1966, with the district director of internal revenue at Chicago, Ill.

Venus Cab Corp. filed corporate income tax returns (Form 1120) for its taxable years ended September 30, 1964, September 30, 1965, and September 30, 1966, with the district director of internal revenue at Chicago, Ill.

Jupiter Cab Corp. filed corporate income tax returns (Form 1120) for its taxable years ended July 31, 1964, July 31, 1965, and July 31, 1966, with the district director of internal revenue at Chicago, Ill.

Leo Cab Co. filed corporate income tax returns (Form 1120) for its taxable years ended September 30, 1964, September 30, 1965, and September 30, 1966, with the district director of internal revenue at Chicago, Ill.

Throughout the years here in question the petitioners' outstanding stock was owned solely by Arthur Dickholtz. The petitioners, during the years in question, operated a fleet of taxicabs in the city of Chicago. Petitioners are considered to be among the "independent" companies as distinguished from Yellow Cab Co. and Checker Taxi Co.

Petitioners purchased taxicab licenses on the dates and for the amounts indicated below; petitioners also claimed deductions for the amortization of such license costs, as follows:

Taxicab licenses — Amortization of licenses

| Company | Fiscal | Date purchased | Cost | Total months amortized | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|---|---|---|---|---|---|
| Courteous Cab Co. | 6/30 | 9/65 | $11,800.00 | 34 | | | $4,824.00 | $4,165.00 | $2,464.00 | $347.00 |
| Four Star Cab Co. | 6/30 | 1/64 | 965.77 | 55 | $105.36 | $211.00 | 211.00 | 211.00 | 211.00 | 16.41 |
| Gemini Cab Co. | 7/31 | 1/64 | 1,964.29 | 55 | 250.00 | 428.00 | 428.00 | 428.00 | 430.29 | |
| | | 4/64 | 8,500.00 | 52 | 653.85 | 1,961.00 | 1,961.00 | 1,961.00 | 1,963.15 | |
| Jupiter Cab Corp. | 7/31 | 1/64 | 4,747.02 | 55 | 903.85 | 2,389.00 | 2,389.00 (sold) | 2,389.00 | 2,393.44 | |
| | | 1/64 | 1,448.66 | 55 | 604.17 | 1,085.00 | 316.00 | 315.00 | 317.29 | |
| | | | | | 184.37 | 316.00 | | | | |
| Leo Cab Co. | 9/30 | 1/64 | 7,500.00 | 55 | 788.54 | 1,636.00 | 1,636.00 | 1,636.00 | 1,364.76 | |
| Venus Cab Corp. | 9/30 | 1/64 | 5,598.21 | 55 | 1,227.24 | 1,221.00 | 1,221.00 | 1,221.00 | 1,019.10 | |
| Public Taxi Service | 9/30 | 12/63 | 7,724.07 | 56 | 916.11 | 1,655.16 | 1,655.16 | 1,655.16 | 1,379.29 | |
| | | 12/63 | 5,742.00 | 56 | 1,379.30 | 1,444.68 | 1,444.68 | 1,444.68 | 1,204.06 | |
| | | 1/64 | 6,250.00 | 55 | 1,203.90 | 1,363.68 | 1,363.68 | 1,363.68 | 136.20 | |
| | | 2/64 | 6,000.00 | 54 | 1,022.76 | 1,777.80 | 1,777.80 | 1,777.80 | 481.40 | |
| | | 2/64 | 7,240.00 | 54 | 1,185.20 | 1,608.84 | 1,608.84 | 1,608.84 | 340.92 | |
| | | 5/64 | 8,750.00 | 51 | 1,072.56 | 1,882.32 | 1,882.32 | 1,882.32 | 568.74 | |
| | | 8/64 | 8,000.00 | 48 | 784.30 | 2,187.48 | 2,187.48 | 2,187.48 | 822.98 | |
| | | 8/64 | 8,730.00 | 48 | 364.58 | 2,182.56 | 2,182.56 | 2,182.56 | 818.56 | |
| | | 11/64 | 8,250.00 | 45 | 363.76 | 2,016.63 | 2,199.96 | 2,199.96 | 1,773.45 | |
| | | 1/65 | 8,625.35 | 43 | | 1,805.31 | 2,407.08 | 2,407.08 | 2,005.88 | |
| | | 1/65 | 6,500.00 | 43 | | 1,360.44 | 1,813.92 | 1,813.92 | 1,611.72 | |
| | | 2/65 | { 9,900.00 / 882.00 } | 42 | | 1,885.68 | 3,224.70 | 3,066.24 | 2,555.38 | |
| | | 6/65 | 12,500.00 | 38 | | 1,316.00 | 3,948.00 | 3,948.00 | 3,288.00 | |
| | | 6/65 | 12,000.00 | 38 | | 1,263.16 | 3,789.48 | 3,789.48 | 3,167.88 | |
| | | 8/65 | 10,000.00 | 36 | | 495.54 | 3,333.24 | 3,333.24 | 2,897.98 | |
| | | 8/65 | 12,000.00 | 36 | | 666.66 | 3,999.96 | 3,999.96 | 3,333.42 | |
| | | 10/65 | 12,000.00 | 34 | | | 4,235.28 | 4,235.28 | 3,529.44 | |
| | | 10/65 | 11,432.00 | 34 | | | 4,034.88 | 4,034.88 | 3,362.24 | |
| | | 10/65 | 11,000.00 | 34 | | | 3,882.36 | 3,882.36 | 3,235.28 | |
| | | | | | 7,376.36 | 24,911.94 | [1] 50,971.88 | 50,812.92 | 42,342.82 | |

[1] Petitioner, Public Taxi Service, Inc., claimed an amortization deduction in the amount of $51,081.38 for its fiscal year ended 9/30/66.

On May 18, 1934, the Chicago City Council passed an ordinance regulating the operation of taxicabs in the city of Chicago. This ordinance was a franchise ordinance granting permission and authority for the operation of taxicabs within the city and for the appointment of a public vehicle license commissioner. The ordinance provided for the issuance of licenses to operate taxicabs in the city for a term ending December 31, 1940, unless sooner terminated or revoked as provided in the ordinance. Based upon this ordinance, 4,108 taxicab licenses were issued in the city of Chicago. The Yellow Cab Co. received 2,166 licenses and the Checker Taxi Co. received 1,500. The remaining 442 licenses were received by "independents" including petitioner, Public Taxi Service, Inc.

As a result of the following period of economic depression, the operation of taxicabs in the city of Chicago resulted in unprofitable operations from the standpoint of the drivers and licensees, resulting in strikes and other violence on the city streets. In 1937, it was determined that a reduction in the number of taxicabs operated in the city and an increase in the fares charged was a matter of public convenience and necessity. Accordingly, on December 22, 1937, the city council passed an ordinance providing for a method of voluntary surrender by licensees of enough of their licenses to reduce the total from 4,108 to 3,000. This ordinance provided that in the event the number of authorized licenses should later be increased above the 3,000 figure, such additional licenses, not to exceed the number surrendered, should first be issued to licensees ratably in proportion to the number voluntarily surrendered by each licensee. The ordinance also provided that authority of the licensees to operate taxicabs under the 1934 ordinance be extended to December 31, 1945, provided the licensees accepted the terms of the 1937 ordinance.

Pursuant to the ordinance of December 22, 1937, the Yellow Cab Company voluntarily surrendered 571 of its licenses and the Checker Taxi Company surrendered 500 of its licenses. Other licensees (independents) surrendered the balance, representing 37 licenses, of the required reduction.

On June 26, 1945, the city council passed an extension ordinance extending the term of the ordinance of December 22, 1937, for 5 years, ending December 31, 1950.

On December 28, 1945, the city council passed a resolution reciting that demands for all forms of local transportation had increased on account of World War II and directed the public vehicle license commissioner to enforce the provisions of the ordinances of December 22, 1937, and June 26, 1945, by compelling full operation of 3,000 taxicabs in the city of Chicago by January 15, 1946. In the event that full oper-

ation of 3,000 taxicabs could not be accomplished by existing licensees, the commissioner was authorized to take steps for licensing additional taxicabs in the city.

On February 28, 1946, the City Council of the City of Chicago passed an ordinance authorizing the public vehicle license commissioner to issue up to 275 additional taxicab licenses. These licenses were to be issued to veterans of World War II (veterans licenses). However, under the ordinance, such licensees did not acquire any rights under or by virtue of the ordinance granting permission and authority for the operation of taxicabs in the city of Chicago and for the appointment of a public vehicle license commissioner, passed by the city council on May 18, 1934, and as subsequently amended. On July 11, 1946, the ordinance of February 28, 1946, was amended by the city council to provide authorization for an increase in the issuance of additional taxicab licenses from 275 to 770.

On February 5, 1947, Chapter 28 of the Muncipal Code of Chicago was amended to provide that the demand for taxicab service in the city of Chicago was found to exceed the 3,000 taxicabs authorized by the ordinance of December 22, 1937, and that the public vehicle license commissioner was authorized to issue taxicab licenses not to exceed 5,500 in number. This amendment also provided that no taxicab license was to be issued to any person unless he was authorized to operate taxicabs by acceptance of the ordinance granting permission and authority for the operation of taxicabs within the city of Chicago passed on May 18, 1934, and as subsequently amended.

On February 6, 1948, an ordinance was passed by the city council repealing the ordinance of February 28, 1946, as amended on July 11, 1946, which provided authorization for the issuance of additional taxicab licenses not to exceed 950 in number.

The expiration date of the ordinance granting permission and authority for the operation of taxicabs within the city of Chicago and for the appointment of a public vehicle license commissioner passed by the city council on May 18, 1934, as subsequently amended, was extended beyond December 31, 1950, pending negotiations for a revised or new ordinance. Such expiration date was first extended to April 1, 1951, then to July 1, 1951, September 30, 1951, and finally to December 31, 1951, by ordinances passed by the city council on December 29, 1950, March 2, 1951, June 14, 1951, and September 20, 1951, respectively. Such extensions of the franchise ordinance of May 18, 1934, as subsequently amended, were expressly made subject to the continuation of the right to operate taxicabs within the city by all persons having taxicab licenses on December 31, 1950, under the provisions of the franchise ordinance extended and under the provisions of the ordinance authorizing the public vehicle license commissioner

to issue not to exceed 950 additional taxicab licenses passed February 6, 1948, as subsequently amended.

On January 30, 1952, the city council again amended chapter 28 of the Municipal Code of Chicago, relating to public passenger vehicles, and passed a new franchise ordinance granting permission and authority for the operation of taxicabs within the city of Chicago until December 31, 1956. Chapter 28 was amended to provide, *inter alia,* for the assignability of a public passenger vehicle license, but only in the event of the licensee's death or induction or recall into the Armed Forces of the United States for active duty. The franchise ordinance passed May 18, 1934, and all ordinances by which such franchise ordinance was amended and extended prior to adoption of the new franchise ordinance on January 30, 1952, were repealed.

The additional taxicab licenses, not to exceed 950 in number, authorized for issuance under the ordinance of February 6, 1948, were merely nonassignable personal privileges in the hands of a licensee. Accordingly, such licenses would lapse or be revoked as the result of the death, incapacity, or call to military service of a licensee. This accounted for the attrition which resulted in a reduction from a total of 3,950 licenses authorized for issuance as of February 6, 1948, to 3,761 on January 30, 1952. No reduction in the number of taxicab licenses was ordained by the city council during this period.

Arthur Dickholtz was among the licensees who filed written acceptance of the new franchise ordinance passed January 30, 1952. The franchise ordinance, not having been extended, expired on December 31, 1956.

On August 24, 1959, the City Council of Chicago passed an ordinance for an increase in the number of taxicab licenses, declaring that 4,600 taxicabs were required by the public convenience and necessity for adequate citywide service. This ordinance was made effective January 1, 1960, and authorized the public vehicle license commissioner to issue additional licenses within the maximum number of 4,600. Under this ordinance, Yellow Cab Co. and Checker Taxi Co. recovered the number of licenses they had voluntarily surrendered under the ordinance of December 22, 1937. 839 new licenses were authorized for issuance and 257 were taken away from the veterans, making a total of 1,096 licenses available which were allocated as follows:

|  | Total | Yellow and Checker | Independents | Veterans |
|---|---|---|---|---|
| Prior to 1/1/60 | 3,761 | 2,595 | 405 | 761 |
|  | 839 | 1,071 | 25 | (257) |
| 1/1/60 | 4,600 | 3,666 | 430 | 504 |

Chapter 28 of the Municipal Code of Chicago, relating to public passenger vehicles, was amended by the city council on July 1, 1963, by adopting an ordinance which provides in pertinent part, as follows:

Section 2. The Municipal Code of Chicago is amended by adding Section 28–1.1 as follows:

28–1.1. Subject to the conditions and limitations of this chapter, exclusive permission and authority are hereby granted to the licensees hereunder and their assigns to operate the taxicabs licensed hereunder upon the public streets and other public ways within the corporate limits of the City unless terminated or revoked as hereinafter provided.

*     *     *     *     *     *     *

Section 5. Section 28–9.1 of the Municipal Code of Chicago is amended to read as follows: [2]

28–9.1. The licenses and the rights and privileges herein granted shall be assignable provided that before any such assignment shall become effective the Commissioner shall find that the assignee is qualified to comply with the terms and conditions of this ordinance and has undertaken to be and become liable for all of the liabilities of the assignor arising out of the operation of the taxicab, the license of which is so assigned, and the original or a certified executed copy of the assignment and undertaking shall be filed with the Commissioner. In the event of a licensee's death, the assignment shall be made by his legal representatives.

*     *     *     *     *     *     *

Section 7. Section 28–15.1 of the Municipal Code of Chicago is amended to read as follows: [3]

28–15.1. In the event that the Commissioner, after investigation and hearing, shall determine that any licensee has obtained any license for any taxicab by fraud or false representation or wilful misstatement of material fact, or in case any licensee shall fail to carry out any representation made to the Commissioner before the issuance of such license, or shall wilfully make any material misstatement of fact on any statement filed with the Commission, or if any cabman or coachman, while in charge of a public passenger vehicle, as a chauffeur, shall operate any public passenger vehicle in violation of the provisions of this chap-

---

[2] Sec. 28–9.1 previously provided as follows:

28–9.1. Limited Assignability. No public passenger vehicle license shall be subject to voluntary assignment or transfer by operation of law, except in the event of the licensee's induction or recall into the armed forces of the United States for active duty or in the event of the licensee's death. In case of death the assignment shall be made by the legal representatives of his estate. No assignment shall be effective unless made to a natural person and until such assignee shall have filed application for a license and is found to be qualified as provided in sections 28–5, 28–5.1. and 28–6. If qualified the license shall be transferred to him by the Commissioner, subject to payment of a transfer fee of $50.00, and approval by the commissioner of the insurance required by sections 28–12 or 28–12.1.

[3] Sec. 28–15.1 previously provided as follows:

28–15.1 *Discretionary Revocation of License.* If any public passenger vehicle license was obtained by application in which any material fact was omitted or stated falsely, or, if any cabman or coachman, while in charge of a public passenger vehicle, as a chauffeur, shall operate any public passenger vehicle in violation of the provisions of this chapter or of the rules and regulations of the commissioner relating to the administration and enforcement of the provisions of this chapter, the commissioner may recommend to the mayor that all public passenger vehicle licenses held by him be revoked and the mayor, in his discretion, may revoke said licenses.

ter or of the rules and regulations of the Commissioner relating to the administration and enforcement of the provisions of this chapter, the Commissioner may recommend to the Mayor that all public passenger vehicle licenses held by him be revoked and the Mayor, in his discretion, may revoke said licenses.

\* \* \* \* \* \* \*

Section 9. Section 28–22.1 of the Municipal Code of Chicago is amended to read as follows: [4]

28–22.1. (a) The maximum number of taxicab licenses to be issued shall be 4600, public convenience and necessity and the safety of existing vehicular and pedestrian traffic requiring such limitation. Each person who is, on the effective date of this ordinance, the owner of one or more uncancelled, unsurrendered and unrevoked licenses issued for the year 1963 under or pursuant to the ordinances in effect on the date of passage of this ordinance, shall be entitled to one license hereunder for each such license now owned by him.

(b) On January 1, 1964 (or as soon thereafter as may be convenient) and on each January 1 thereafter, the Commissioner, upon application therefor, shall issue to each taxicab licensee hereunder, one such license for each unrevoked, uncancelled, and unsurrendered taxicab license owned by such licensee on the December 31 next preceding.

(c) The Council, through its Committee on Local Transportation may, and at the request of the holders of a majority of the licenses at any time outstanding shall within sixty days after such request, hold hearings not oftener than once in each period of twelve consecutive months to determine whether public convenience and necessity may require additional taxicab service. At such hearings, the Committee shall consider:

(I) the effect of an increase in the number of such vehicles on the safety of existing vehicular and pedestrian traffic;

(II) the public demand for the service;

(III) the effect of additional taxicabs on the wages or other compensation, hours and conditions of service of licensed drivers of vehicles then operating and previously licensed;

(IV) the effect of an increase of competition with existing service on the cost of rendering such service;

---

[4] Sec. 28–22.1 previously provided as follows:

28–22.1. *Public Convenience and Necessity.* Not more than 4600 taxicab licenses shall be issued unless after a public hearing, the commissioner shall report to the council that public convenience and necessity require additional taxicab service. Notice of such hearing, stating the time and place thereof, shall be published in the official newspaper of the city at least 20 days prior to the hearing, and by mailing a copy thereof to all licensed cabmen. At such hearing the commissioner may call upon any person qualified to testify and offer evidence pertinent to the subject. Any licensed cabman, in person or by attorney, shall have the right to be heard. At any time and place fixed for such hearing it may be adjourned to another time and place without further notice.

In determining whether public convenience and necessity require additional taxicab service, due consideration shall be given to the following:

(1) The public demand for taxicab service;

(2) The effect of an increase in the number of taxicabs on the safety of existing vehicular and pedestrian traffic;

(3) The effect of increased competition on the revenue of cabmen from the operation of taxicabs and on the wages or compensation, hours and conditions of service of taxicab chauffeurs;

(4) The effect of a reduction, if any, in the level of net revenues from taxicab operations on reasonable rates of fare;

(5) Any other facts which the commissioner may deem relevant. If the commissioner shall report that public convenience and necessity require additional taxicab service, the council, by ordinance, may change the maximum number of taxicab licenses fixed herein.

(V) the effect of additional licenses on the rates of fare which the Council may be required to revise under section 28–30 hereof.

\* \* \* \* \* \* \*

(d) If the Council shall authorize the issuance of additional licenses, they shall be issued on application:

(I) to licensees then holding more than one license, the same proportion of the number of licenses to be issued as the number of licenses then held by such licensee bears to the total number of licenses then outstanding, giving no effect to fractions of licenses; and

(II) the balance to individual applicants who are not then licensees, one license to each on the basis of whichever applicants are best qualified in the opinion of the Commissioner.

\* \* \* \* \* \* \*

Section 15. The Municipal Code of Chicago is amended by adding Section 28–33 to read as follows:

. 28–33. This ordinance shall not be amended during the period of five years from its effective date except in accordance with the provisions of Sections 28–7, 28–9, 28–9.1, 28–22, 28–22.1, 28–30 and 28–31.2 hereof and during the period of one year from its effective date with respect to any other provisions hereof.

\* \* \* \* \* \* \*

Section 18. The Municipal Code of Chicago is amended by adding Section 28–36 to read as follows:

28–36. This ordinance shall be effective upon its passage and publication.

[Underscoring omitted.]

From 1960 until the ordinance of July 1, 1963, was adopted, a veterans license sold for approximately $2,400 to $3,000. The 1963 ordinance made licenses freely assignable; consequently the price for veterans licenses rose to approximately $6,000 to $7,000 in that year.

Radio Flash Corp. (Radio), also owned by Dickholtz, performed maintenance service, radio dispatch service, repair service, etc., for the independents. After the passage of the 1960 ordinance, Radio lost between 98 and 100 subscribers to its services, all of whom were veterans. Under the 1960 ordinance and its attendant reallocation of licenses, the veterans lost 257 licenses to Yellow, Checker, and the independents. The loss of subscribers was directly attributable to this redistribution whereby the independents gained a mere 25 licenses of the 257 which were taken from the veterans. The remainder of these were allocated to Yellow and Checker who maintained and serviced the taxicabs receiving these licenses themselves.

Prior to passage of the 1963 ordinance, petitioner, Public Taxi Service, Inc., did not acquire any veterans licenses. However, after the ordinance was passed, Public Taxi Service, Inc., acquired a substantial number of such licenses. Petitioners herein seek to amortize the veterans cab licenses they acquired subsequent to adoption of the 1963 ordinance.

The Commissioner determined that the licenses had indeterminate useful lives and were therefore not subject to amortization.

OPINION

We must decide if the taxicab licenses acquired by petitioners since 1963 (the veterans licenses) are proper subjects for amortization under section 167, I.R.C. 1954,[5] and section 1.167(a)–3 of the Income Tax Regs. The regulations provide as follows:

Sec. 1.167(a)–3  Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expenditures, see section 177 and the regulations thereunder.

The crucial factor herein is whether or not the useful lives of these licenses are limited in duration. Petitioners argue that they are entitled to amortize the licenses and the period over which they may take the deductions is 5 years—the length of time during which the July 1, 1963, ordinance may not be amended with respect to increasing the maximum number of taxicabs.

Petitioners contend that the 5-year nonamendable provision of the ordinance amounts to "a term franchise, a term license, [or] in other words, a contract ordinance." After June 30, 1968, the city would be free to act in any manner it chose with regard to taxicab licenses. "In other words, all rights of the licensees expired on June 30, 1968, and the rights thereafter depended upon a new ordinance."

Further say petitioners, the history of the taxicab industry in Chicago since 1934 (which we have traced in our Findings of Fact) is a highly fluctuating one and there is no assurance that, as of a time prior to June 30, 1968, the number of licenses would not again be reduced upon the expiration of the 5-year term of the 1963 ordinance. Any reduction in the number of licenses would of necessity have to be made from the veterans licenses (the ones involved herein) because those held by Yellow, Checker, and the independents were fixed. See *Yellow Cab Co.* v. *City of Chicago*, 396 Ill. 388, 71 N.E. 2d 652 (1947). There-

[5] All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.

fore, due to this uncertainty, the petitioners were entitled to amortize the licenses over a 5-year term.

The Commissioner's argument is that the licenses had indeterminate useful lives and were not therefore properly entitled to any allowance for amortization. He says that the ordinance of 1963 speaks only in terms of an increase in the number of taxicabs and not of a reduction, and that any reduction which would take place would have to comply with the same standard to be employed in authorizing any increase; that of "public convenience and necessity." And he states, contrary to petitioners' assertion, that there has only been one decrease in the number of licenses and that was of a voluntary nature on December 22, 1937, due to the economic conditions existing at that time. The history of the industry since then shows only increases due primarily to the issuance of veterans licenses. Actions of the city council and section 28–22 of the 1963 ordinance [6] clearly show that the public convenience would be best served by maintaining or issuing the number of licenses authorized.

Finally, says the Commissioner, petitioners have not shown that from experience it is known that licenses will be of value in petitioners' business for only a limited time or that the length of their usefulness can from experience and with reasonable certainty be estimated to be the 5-year term of the nonamendatory provision of the 1963 ordinance.

We are of the opinion that these licenses are not properly the subject of an allowance for amortization. It appears to us that the useful lives of the licenses stretch over a period not restricted by the nonamendatory provision of the 1963 ordinance. True, the city council may effect changes in the license system after the expiration of 5 years, but we think that any such changes would be in the nature of increases rather than reductions. We feel that silence of the ordinance on the subject of reductions is highly significant. Such silence would appear to mean that the possibility of a reduction is so remote as to make mention of it needless. See *Morris Nachman*, 12 T.C. 1204 (1949), affd. 191 F. 2d 934 (C.A. 5 1951). Any one who has tried to hail a taxicab in any of our metropolitan centers might well think a reduction in their number to be abhorrent.

The licenses in question herein, the veterans licenses, formerly had a second-class status within the taxicab industry in Chicago by virtue of their nonassignable nature. However, the 1963 ordinance removed

---

[6] 28–22. Every taxicab shall be operated regularly to the extent reasonably necessary to meet the public demand for service. If the service of any taxicab is discontinued for any reason except on account of strike, act of God, *shortages of labor, gasoline or other necessary materials* or cause beyond the control of the cabman, the Commissioner may give written notice to the cabman to restore the taxicab to service, and if it is not restored within five days after notice, the Commissioner may recommend to the Mayor that the taxicab license be revoked and the Mayor, in his discretion, may revoke same.

this detrimental characteristic and the veterans licenses now rank in the same class as those of the independents. Any reduction in the number of licenses would not be at the whim of the city council as petitioner suggests but rather, in our opinion, would have to follow established procedures for the taking of property, i.e., due process. We reach this conclusion on the basis of the value attributable to the licenses and the capital required effectively to implement the rights granted by such license. Therefore, we think that the petitoners' claim, that at the expiration of the nonamendatory provision, their licenses are subject to the unfettered discretion of the city council, is without substantial merit.

Further, we must agree with the Commissioner that the history of Chicago's taxicab industry is not as volatile as petitioners claim. Over the years, since 1934, there have been many ordinances affecting the industry and several amendments to the Municipal Code in the same regard. However, a careful reading thereof reveals that the trend has been to increase the number of taxicabs serving Chicago. Petitioners' claim that the actions of the city as they relate to petitioners' business leave great doubts as to future actions is also substantially without merit. See *Toledo T. V. Cable Co.*, 55 T.C. 1107, 1117 (1971).

We note that between January 1, 1957, and June 30, 1963, no franchise ordinance or nonamendatory provision was in effect, yet petitioners lost no licenses during this period. We agree with the Commissioner that there has been no showing that from experience it is known that the licenses will be of value in petitioners' business for only a limited period, or that their duration can from experience and with reasonable certainty be estimated to be only the current term of the nonamendatory provision.

Due to the pro forma nature of the renewal procedures [7] the possession of a valid license upon the expiration of the 5-year nonamendatory provision, June 30, 1968, lends much weight to the position that the licenses have a period of value extending beyond that date, for the 5-year period expires in the middle of the term of a renewal and a reduction in the number of licenses upon the expiration of the nonamendatory provision would nullify those rights acquired by a renewal. See *Victor E. Stromsted*, 53 T.C. 330, 344 (1969), and *George Wynn Smith*, 55 T.C. 133 (1970) on appeal (C.A. 6, Jan. 25, 1971). For the foregoing reasons,

*Decisions will be entered for the respondent.*

---

[7] Municipal Code of Chicago :

Sec. 28-22.1(b) On January 1, 1964 (or as soon thereafter as may be convenient) and on each January 1 thereafter, the Commissioner, upon application therefor, shall issue to each taxicab licensee hereunder, one such license for each unrevoked, uncancelled, and unsurrendered taxicab license owned by such licensee on the December 31 next preceding