OPINION. Kern, Judge: The primary issue in this case concerns the proper depreciation bases to petitioner of the properties formerly owned by the Queens, Boosevelt, and Baldwin Companies. Kespondent contends that these properties were acquired in connection with reorganizations as defined in either section 112(g) (1) (A) and (IT) of the Internal Revenue Code of 1939 or section 203(h) (1) (A) and (D) of the Revenue Act of 1924, and therefore the bases should be the same as in the hands of the transferor corporations. The petitioner contends that there were no statutory reorganizations and that when the transactions are considered in their entireties they are in reality purchases of assets by petitioner and therefore petitioner’s basis must be cost. Petitioner cites in its argument on brief Southwell Combing Co., 30 T.C. 487; Orr Mills, 30 T.C. 150; Estate of James F. Suter, 29 T.C. 244; Montana-Dakota Utilities Co., 25 T.C. 408; American Wire Fabrics Corporation, 16 T.C. 607; and Illinois Water Service Co., 2 T.C. 1200. A number of those cases rely upon the principle laid down in Commissioner v. Ashland Oil & Refining Co., 99 F. 2d 588; Koppers Coal Co., 6 T.C. 1209; and Kimbell-Diamond Milling Co., 14 T.C. 74, affd. 187 F. 2d 718, commonly referred to as the Kimbell-Diamond rule. In discussing those cases in John Simmons Co., 25 T.C. 635, we said at pages 641-642: Our examination of the cases cited * * * convinces us that the principle enunciated therein was intended to be and should be limited to the peculiar situations disclosed by the facts in each of those cases * * *. In each of those cases it appeared that an existing corporation had as its primary purpose or indeed its sole purpose, the purchase of a particular asset or a group of assets of another corporation, but was forced by circumstances "beyond Us control to effect the acquisition through the channels of first acquiring stock and then liquidating the subsidiary. * * * [Emphasis supplied.] In North American Service Co., 33 T.C. 677, 690-691, we stated the rule to be “that where a going business desires to acquire the asset of another corporation and the only means available by which it can acquire that asset is to purchase dll of the outstanding stock and liquidate the acquired corporation, the complete liquidation of the acquired corporation will be treated as one of the steps of a single transaction, namely, the purchase of an asset.” (Emphasis supplied.) In Orr Mills, supra at 154, we stated the rule to be “that where a taxpayer, interested primarily in a corporation’s assets, is compelled to first purchase stock and then liquidate the corporation in order to acquire the desired assets, the separate steps taken to accomplish the primary objective will be treated as a single transaction.” (Emphasis supplied.) These cases clearly indicate that a prerequisite to the application of the so-called Kimbell-Diamond rule is the impossibility of accomplishing the direct acquisition of assets and the consequent necessity of purchasing the stock of the corporation owning the assets sought to be acquired. The record herein does not disclose any unsuccessful negotiations for the direct purchase of the assets of any corporation at any time or any other circumstance which would make the direct purchase of the assets impossible. The position of the petitioner on this point may be summarized as follows: The underlying purpose of petitioner and those acting for it was to acquire the physical assets of Queens, Roosevelt, and Baldwin, as indicated by (1) the fact that appraisals of such assets were made prior to the purchases, (2) the conclusion drawn in petitioner’s brief that the Transportation Corporation Law of New York dealing with Water-Works Corporations (under which petitioner was organized), to quote petitioner’s brief, “confines its corporate powers to the ownership and operation of the necessary physical properties to carry on a water distribution business,”[1] and (3) the fact that immediately after the acquisition by petitioner of all of the stock of each company the petitioner by merger acquired the ownership of the properties owned by each and then integrated such properties into a single system, thus supplying “the pragmatic test of the ultimate result.” Petitioner then argues that the Kimbell-Diamond rule applies. This position is equivalent to advancing the proposition that where a corporation desires to acquire the totality of the business assets[2] of another corporation and chooses on its own volition to effect such acquisition by purchasing the stock of the other corporation and then merging such other corporation with itself, the provisions of the Code dealing with acquisitions of properties incident to tax-free reorganizations should be ignored and the basis of the business assets thus acquired in the hands of the acquiring corporation shall be its cost of the stock purchased. As we have already indicated, the prior opinions of this Court do not support this proposition and the statements made by us of the Kimbell-Diamond rule directly contradict it. We are not disposed to alter our position on this matter or to overrule our prior statements with regard thereto. Respondent contends that the integration-of-assets factor is also a prerequisite to the application of the Kimbell-Diamond rule. This contention has been rejected in North American Service Co., supra. See also United States v. Mattison, 273 F. 2d 13.[3] This remains an important factor for consideration in cases of this type, but it is not a prerequisite to the application of the rule. Even if prior unsuccessful negotiations for the direct acquisition of assets or other circumstances demonstrating the impossibility of such direct acquisition do not constitute a prerequisite to the application of the Kimbell-Diamond rule but merely constitute an important factor to be considered in determining whether the sole purpose for the purchase of the stock of a corporation was to acquire its assets, similar to other factors such as integration of assets or “stripping down” of assets, we would nevertheless find it impossible to conclude that petitioner has proved that the acquisition by it of the stock of the Queens Company through the transactions described in our findings was for the sole purpose of acquiring assets. Those matters pointed to by petitioner as proving such purpose have been set forth above. We do not consider it important that a preliminary appraisal of the assets of Queens was made before the Queens stock was bought. We do not know what other investigations were made. The fact that such an appraisal of assets was made is in no way inconsistent with a purpose to buy the stock of Queens since an approximation of the value of the assets of Queens would be a pertinent factor in an estimate of a fair price to be offered for its stock regardless of the purpose for its acquisition. The detailed inventory and appraisal made af ter the acquisition of the stock would be irrelevant to the question of the purpose for such acquisition. Nor are we impressed by petitioner’s assertion that under the New York laws governing its organization (which we have outlined above) it was required to own physical assets directly rather than through a wholly owned operating subsidiary. Our construction of these laws does not accord with petitioner’s assertion and petitioner has not cited any decided cases which would support it. We do consider it to be an important factor for our consideration that immediately after the acquisition by petitioner of all of the Queens stock it acquired by merger the direct ownership of all of Queens’ properties. However, as against this factor in petitioner’s favor, there are other important factors militating against it: The absence of a showing that it was impossible for petitioner to acquire the assets of Queens by a direct purchase (if this be a factor rather than a prerequisite), the fact that petitioner, at the time it purchased the Queens stock, had no business and owned no assets into which the assets of Queens could be integrated, and the fact that all of the assets owned by Queens and used by it in a going business were acquired without any “stripping down.” Considering this balance (or, rather, imbalance) of pertinent factors we would be unable to conclude that petitioner has borne its burden of proving that the sole or primary purpose of acquiring the Queens stock was to acquire its assets. We understand petitioner to further argue that, regardless of the applicability of the so-called Kimbell-Diamond rule, the properties here involved were not acquired pursuant to a statutory reorganization since there was not the requisite continuity of interest or control. Petitioner contends that the transaction consisted of a series of interdependent steps and must be considered as a whole. Thus considered, according to its argument, the transaction began with the oral agreement made between Marshall Field and Associated sometime prior to April 1925, and ended with the formal merger of Baldwin with petitioner in the early part of 1927, resulting in the properties here involved being owned by a new corporation owned by stockholders having no relationship to the stockholders of the corporations owning the properties at the beginning of the transaction. Two cases are particularly relied on by petitioner in this connection: Southwell Combing Co., supra,[4] and American Wire Fabrics Corporation, supra. In the latter case we said at page 613: The test to be applied in order to determine whether a particular transaction is complete in itself or whether it is merely a step in a series of integrated transactions or, put another way, whether a series of steps should be treated as a single, indivisible transaction or should retain their separate entity is whether the various steps were “so interdependent that the legal relations created by one transaction would have been fruitless without the completion of the series.” American Bantam Car Co., 11 T.C. 397, affd., 177 Fed. (2d) 513. See also, ACF-Brill Motors Co., 14 T.C. 263, Independent Oil Co., 6 T.C. 194; Spang, Chalfant & Co., 31 B.T.A. 721; Paul, Selected Studies in Federal Taxation, 2d Series, pp. 200-254. * * * Looking to the facts of the instant case and again bearing in mind that the burden of proof is on petitioner, it is clear to us that the acquisition by petitioner of the stock of Eoosevelt and Baldwin and the subsequent mergers of those two companies with petitioner were not so integrated with or interdependent upon the prior transactions that we can say that the legal relations created by the prior transactions would have been fruitless if they had not been accomplished. The acquisition by Associated (in cooperation with and assisted by Marshall Field) of an operating water company on Long Island in all probability led to the later acquisition of the Eoosevelt and Baldwin Companies, but nothing in the record convinces us that the plan for the acquisition of the first operating company (Queens) or its merger into petitioner contemplated or would have been fruitless without the subsequent acquisitions of Eoosevelt and Baldwin. Leaving out of consideration the acquisition of Eoosevelt and Baldwin, petitioner’s argument is more convincing when confined to the acquisition by merger of the properties formerly owned by Queens. The crux of the question thus presented is whether the acquisition by Associated and Marshall Field of all of the stock of Queens and the organization of petitioner with its acquisition of all of Queens’ properties by merger may be considered as two separate transactions or must be considered as interdependent steps in one transaction. The facts herein clearly show that the formation of petitioner and its acquisition of the property of Queens constituted “a contemplated possibility under the plan that actually eventuated” and must therefore be considered as an interdependent step therein. Avco Manufacturing Corporation, 25 T.C. 975, 983-986. We therefore consider that all of the steps taken pursuant to the plan beginning with the oral agreement between Associated and Marshall Field sometime prior to April 1925 and ending with the merger of Queens into petitioner on May 8, 1925, must be considered as interdependent steps of one integrated transaction which, when completed, resulted in the property formerly owned by Queens being thereafter held by petitioner. Since the former stockholders of Queens had no relationship to the stockholders of petitioner and retained no vestige of ownership or control with regard to the property acquired by petitioner there could not be the continuity of control or ownership required in a statutory reorganization. American Wire Fabrics Corporation, supra. We therefore conclude that the petitioner’s basis as to the property formerly owned by Queens was its cost, and that its basis as to the properties formerly owned by Roosevelt and Baldwin was the bases of those corporations. The cost of assets received in exchange for securities is the fair market value of the securities . exchanged. Hazeltine Corporation, 32 B.T.A. 110. The petitioner’s basis for the land sold in 1951 must be determined by allocating the cost to the various assets acquired. C. D. Johnson Lumber Corporation, 12 T.C. 348, 363: Wren Bowyer, 33 T.C. 660. The petitioner paid $4,583,556.03 for land appraised at $661,400 and depreciable property appraised at $3,875,343.68. (This figure was obtained by subtracting from the appraised reproduction cost new the reserve for depreciation estimated by the public utility engineer.) By applying appropriate comparisons expressed as percentage amounts of the appraised net depreciated value, the cost of the depreciables to petitioner is found to be $3,915,331.31 and the cost of the land is found to be $668,224.72. The 281.428-acre tract was appraised in 1925 at $509,000, and the application of a percentage comparison (509,000/661,400) discloses that the portion of the total cost figure applicable to this tract was $514,252.11. The land was found to be of varying worth, and the parcel sold was not the most valuable piece of the tract. Applying percentages comparing the appraised value of the parcel sold to the entire appraised value of the tract, based upon recent appraisals of 1925 values, the basis to petitioner of the parcel sold in 1951 is found to be $72,610.34. Adding to this figure the costs of the sale, amounting to $5,234.50, petitioner sustained an ordinary loss of $3,344.84 in 1951. See sec. Il7(j), I.R.C. 1939. The parties were unable to agree upon the composition of peitioner’s gross depreciable base. The rate of depreciation allowed by the respondent is not an issue before this Court. The parties have stipulated that the rate used over the years was 1.8 percent of the gross depreciable base. That base is the cost of the property increased by any additions and decreased by any reductions necessitated by the sale or other disposition of property included therein. We see no merit in the petitioner’s contention that Internal Revenue Service Bulletin F authorizes the addition to the gross depreciable base of a beginning depreciation reserve in the event the property purchased is used property. While that is a factor that may be considered in choosing the applicable rate, it is not a factor to be considered when the rate is agreed upon and only the gross depreciable base itself is in issue. The parties were unable to agree upon the correctness of the reductions in basis required of petitioner by the respondent in 1929 and 1931 as a result of the sale of land and other property acquired from Queens and Roosevelt. As an alternative issue, in the event we decided (as we have) that the petitioner’s basis for the property formerly owned by Roosevelt and Baldwin .was the bases of those corporations, the petitioner affirmatively alleged that the respondent had excessively reduced its tax base for purposes of depreciation as a result of the sale of depreciable property acquired from Roosevelt to the Village of Freeport in 1929. The respondent asserts that his reduction was proper in view of the lack of evidence of the original cost or other basis of the property in the hands of the transferor. The respondent’s reduction in petitioner’s tax basis for purposes of depreciation, occasioned by this sale in 1929, was $93,616, which amount exceeds the basis to which we have determined the petitioner is entitled for all of the depreciable property it acquired from Roosevelt. The parties stipulated that Roosevelt’s book value of this property was $93,531.07. They further stipulated that the appraised value of this same property on petitioner’s books was $221,641.29. The undepreciated 1925 book value of the property sold in 1929 was $62,113.74. Adding the net additions to the date of sale ($5,274.95) to the product obtained by utilizing a ratio comparing the appraised value of the property sold to the appraised value on petitioner’s books of all the depreciable property acquired from Roosevelt as one factor, and the book value of all of the depreciables in the hands of the trans-feror as another factor, we have determined that the transferor’s basis of the property sold by petitioner in 1929 was $31,486.47. The reduction in petitioner’s tax basis for purposes of depreciation resulting from the sale in 1929 should be in that amount, and any reduction beyond that amount was, in view of our findings, excessive. Having determined that petitioner’s basis as to the property formerly owned by Queens is its cost and having determined the amount of such cost, we assume that the parties will be able to agree in computation under Hule 50 on the proper amount by which petitioner’s tax basis for purposes of depreciation should be reduced on account of the sale in 1931 to the City of New York of a part of the property acquired by petitioner from Queens.[5] This may be done by making a proper allocation of a part of petitioner’s total cost of Queens’ de-preciable property to the depreciable property sold such as, for example, by allocating that proportion of such total cost which the appraised value of the property sold bears to the appraised value of all of the depreciable property acquired from Queens. Decision will be entered, wider Rule 60. Petitioner cites section 80 of such- law which requires that every such corporation must supply water to the communities, and section 82 which provides that “such corporation shall have the following additional powers: 1. To lay and maintain its pipes and hydrants * * *. 2. To lay its water pipes » * *. 3. To cause * » * examinations and surveys for its proposed waterworks to be made * * *” In this case there was obviously no “stripping down” of the assets to be acquired. See Estate of James F. Suter, 29 T.C. 244. It should be noted that in that case the facts stated do not affirmatively show prior unsuccessful negotiations for the direct acquisition of assets. However, this point was not considered in the opinion and; does not appear to have been raised. In tills case tliere was also a consideration of the Kimbell-Diamond rule by way of dictum In discussing an alternative contention. The amended petition indicates that this may be a question even though we determine that petitioner’s basis as to this property is its cost, while it is referred to on brief as an issue which would only be present if we decided that its basis was that of the transferor, Queens.