MILLS PHARMACEUTICALS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6035-69.   Filed December 7, 1971.

*Allen A. Yoder*, for the petitioner.

*Tom G. Parrot* and *Charles B. Tetrick*, for the respondent.

STERRETT, *Judge:* The Commissioner determined deficiencies in the petitioner's Federal income tax, as follows:

| Taxable year | Amount |
|---|---|
| Jan. 1, 1964, to Oct. 31, 1964 | $2,709.87 |
| Oct. 31, 1965 | 3,143.51 |
| Oct. 31, 1966 | 3,121.78 |

The issue for adjudication is whether petitioner, Mills Pharmaceuticals, Inc., is entitled to amortization deductions under section 167(a), I.R.C. 1954,[1] for the years in question with respect to an amount allegedly paid for a covenant not to compete or, in the alternative, with respect to an alleged premium paid for an intangible asset.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Mills Pharmaceuticals, Inc. (hereinafter referred to as petitioner), was incorporated under the laws of Missouri. At all times material hereto its principal office was at St. Louis, Mo. Petitioner filed U.S. corporation income tax returns on the accrual method of accounting for the taxable years ended October 31, 1964, October 31, 1965, and October 31, 1966, with the district director of internal revenue at Los Angeles, Calif.

---

[1] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[2] Petitioner for the years ended Oct. 31, 1964, and Oct. 31, 1965, claimed deductions for the amortization of a covenant not to compete. For the year ended Oct. 31, 1966, petitioner altered the designation of the alleged intangible from a covenant *not to compete* to a favored-price contract. Petitioner now contends that the amortization deduction is permissible due to an alleged premium paid for the assets of Stanford Laboratories, Inc.

Stanford Laboratories, Inc. (hereinafter referred to as Stanford), was incorporated under the laws of Missouri on December 30, 1955, for the purpose of producing and selling a specialized line of medication. The original stockholders of this corporation were George B. Koors, Jr. (hereinafter referred to as Koors), and John W. Brandle (hereinafter referred to as Brandle), each owning a 50-percent interest.

On September 25, 1958, C. Dean Cole (hereinafter referred to as Cole) was hired as the west coast sales agent of Stanford on an exclusive basis for the sale of the drugs produced by Stanford. In July of 1960, Cole terminated his employment with Stanford. He then purchased all of the common stock of petitioner, a competitor of Stanford, from a Dr. Tedrick, Dr. Tedrick's wife, and the corporate bookkeeper. Cole then became president of petitioner.

On July 19, 1960, an agreement was executed by and between Stanford and petitioner, whereby Stanford withdrew from competition with petitioner, and petitioner obtained the exclusive right to purchase for sale, distribution, and promotion the products manufactured by Stanford at the following prices:

First $140,000 of sales per annum, at 80% of selling price.
Next $140,000 of sales per annum, at 55% of selling price.
All in excess of $280,000 of sales per annum, at 50% of selling price.

This agreement will be referred to as the 80-percent contract.

The 80-percent contract was performed by both parties. However, Cole indicated to Koors that he was dissatisfied with it; the price charged by Stanford was too high to permit petitioner to compete successfully in the market, thereby creating extreme financial difficulties for it. In a letter to Stanford dated June 22, 1961, Cole confirmed this situation and noted four possible alternatives available to alleviate the predicament. They were:

1. To purchase Stanford at a fair price.
2. To rewrite existing contract between Mills and Stanford on a more equitable basis.
3. To sell Mills.
4. To prove that Dr. Tedrick had breached his contract with Cole, thus canceling the agreement and returning Mills to Tedrick or to forfeit.

As a result of the letter Koors and Cole worked out an agreement whereby petitioner was to secure control of Stanford. In accordance with the above-mentioned arrangement the board of directors of petitioner authorized Cole to enter into and conclude negotiations for the purchase of the stock of Stanford. Cole was authorized to pay $100,000

for the stock of Stanford, $50,000 for existing inventory, and approximately $15,000 for differentiating inventory as of May 1, 1961.

On August 30, 1961, petitioner entered into a contract (hereinafter sometimes referred to as the contract of purchase) with Koors and Brandle, whereby petitioner agreed to purchase and Koors and Brandle agreed to sell all the shares of common stock of Stanford for a total consideration of $185,820, which was the price asked by the sellers. Petitioner issued two promissory notes, both having a face amount of $92,910, naming Koors and Brandle as payees. The contract did not contain a covenant not to compete. Stanford's balance sheet was included within the contract. The balance sheet reflected a value attributable to the total assets of $52,033.97 which did not include any amount allocable to the 80-percent contract or Stanford's goodwill.

In arriving at the sale price Koors and Brandle determined the value of Stanford's assets, including the 80-percent contract. In calculating the value of the contract they started with a figure of $112,000 representing 80 percent of the first $140,000 of sales. From this figure they subtracted $63,000 which represented 45 percent of the first $140,000 of sales. The difference, $49,000, was doubled due to the contract's estimated 2-year life and rounded to $100,000. They added an additional $85,820 representing the remaining assets held by Stanford, arriving at the above-noted sale price. These computations were made and discussed only by the sellers, Koors and Brandle, for the purpose of arriving at a gross sales price of the Stanford stock; they were never mentioned or discussed with petitioner.

Immediately following the sale of the Stanford stock to petitioner, an agreement designated "favored price and exclusive management agreement" (hereinafter referred to as favored-price agreement) was executed by and between Stanford, Koors, Brandle, and Norwood Laboratories, Inc. (hereinafter referred to as Norwood). Norwood, which was owned by Koors and Brandle, had been operating as a sales corporation selling privately labeled pharmaceuticals throughout the country. The favored-price agreement provided in part that Norwood and its stockholders Koors and Brandle would sell to Stanford all the drugs specified within the agreement on an exclusive basis at the rate of 45 percent of the list price of said drugs. It also contained a covenant not to compete, whereby Norwood agreed not to compete with Stanford in the sale or distribution of the drugs.[3]

---

[3] Petitioner was unfamiliar with the production end of the drug business. Therefore, Stanford transferred manufacturing equipment to Norwood which agreed to supply Stanford with the needed drugs.

The contract of purchase and the favored-price agreement were both executed as part of the same transaction. The contract of purchase did not allocate any portion of the $185,820 sale price to any of the provisions contained in the favored-price agreement nor did the favored-price agreement note any designation of monetary consideration for the agreements contained therein.

An "addendum memorandum agreement" was subsequently executed. It provided that it amended, modified, and extended the 80-percent contract currently in effect and specifically provided for the sale of products from Stanford to petitioner at 45 percent of list price.

The transaction consummated by and between petitioner, Koors, and Brandle on August 30, 1961, was recorded on the books of the petitioner as follows:

| | | |
|---|---|---|
| Investment, Stanford Laboratories, Inc | $100, 304. 95 | |
| Restrictive covenant | 65, 037. 00 | |
| Inventory | 16, 378. 62 | |
| Accounts payable—Stanford | 4, 099. 43 | |
| Notes payable { G. B. Koors | | $92, 910. 00 |
| { J. W. Brandle | | 92, 910. 00 |

Cole, as president of petitioner, could not recall any details with respect to the allocation on petitioner's books and records of $65,037 to a covenant not to compete.

After these transactions, Norwood experienced difficulty with petitioner in collecting accounts receivable, and payments on the notes issued to Koors and Brandle were not kept current. As a result, Miller Laboratories, Inc. (hereinafter referred to as Miller), a corporation owned by Koors and Brandle, acquired control of petitioner in December of 1962, by paying Dr. Tedrick, then controlling shareholder of petitioner, $30,000 for his stock. At the time the stock was transferred to Miller the books and records of petitioner were in general confusion as to what the alleged intangible asset at issue herein actually represented.

For the taxable years ended October 31, 1964, and October 31, 1965, petitioner claimed deductions for the amortization of a covenant not to compete in the amounts of $5,419.75 and $6,503.70, respectively. For the year ended October 31, 1966, however, petitioner changed the designation of the alleged intangible asset, with respect to which it was claiming amortization deductions, from a covenant not to compete to a favored-price contract. An amortization deduction of $6,503.70 was claimed in 1966. No evidence was introduced to explain the reason for changing the designation of the alleged intangible asset.

Koors and Brandle reported the entire gain which they realized on the sale as capital gain.

312

The issue for determination relates to whether petitioner in acquiring the stock of Stanford is entitled to amortization deductions under section 167, which states in part:

SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.[4]

This decision rests upon whether a portion of the purchase price was allocable either to a covenant not to compete or to an alleged premium paid for Stanford's assets.

The facts which give rise to this controversy are set forth in our findings and may be briefly summarized. On July 19, 1960, petitioner and Stanford executed a contract whereby petitioner obtained the exclusive right to purchase for resale the products manufactured by Stanford at 80 percent of the list price. It developed that the price at which petitioner had agreed to purchase Stanford's products placed it at a competitive disadvantage in the marketplace. Therefore on August 30, 1961, petitioner entered into a contract with Koors and Brandle, the stockholders of Stanford, to buy their entire interest in Stanford. The price set was $185,820. Immediately thereafter Stanford, now owned by petitioner, contracted with Norwood, Koors, and Brandle, whereby Norwood would supply Stanford with a specified list of drugs at 45 percent of the list price. Included within this contract was a covenant not to compete in which Norwood agreed not to compete with Stanford. An addendum memorandum agreement was then executed, which provided that it amended the 80-percent contract by providing for the sale of drugs from Stanford to petitioner at 45 percent of list price. Petitioner on its return, for the years ended October 31, 1964 and 1965, claimed deductions for the amortization of a covenant not to compete. For the year ended October 31, 1966, petitioner altered the designation of the alleged intangible from a covenant not to compete to a favored-price contract. Petitioner now contends that the amortization deduction is permissible due to an alleged premium paid for the assets of Stanford.

---

4 Sec. 1.167(a)–3. Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income only for a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. * * * An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *

Looking to petitioner's first premise, the existence of a covenant not to compete, we note that the amount a purchaser pays for a covenant in connection with the sale of a business is an amortizable item to the purchaser unless the covenant is so closely related to the sale of goodwill. *Commissioner* v. *Gazette Tel. Co.*, 209 F. 2d 926 (C.A. 10, 1954), affirming 19 T.C. 692 (1953). However, this general principle presupposes the existence of a covenant to amortize. The contract of sale between petitioner and Koors and Brandle provided only for the sale of the Stanford stock.

The Court of Appeals for the Second and Third Circuits have imposed two different tests in determining the applicability of a covenant not to compete when the tax consequences of such a covenant are in issue. The Second Circuit in *Ullman* v. *Commissioner*, 264 F. 2d 305, 308 (C.A. 2, 1959), affirming 29 T.C. 129 (1957), stated:

that when the parties to a transaction * * * have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. * * *

The Third Circuit in *Commissioner* v. *Danielson*, 378 F. 2d 771, 775 (C.A. 3, 1967), stated in part:

a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * *

As we noted above, the contract entered into between petitioner and Koors and Brandle did not contain a covenant. Further, petitioner has failed to demonstrate any evidence which would indicate the contract to be any different than as written; the parties intended only to effect a transfer of the stock interest from one to the other. Therefore, relying on either *Ullman* or *Danielson*, it is apparent that petitioner has failed to meet its required burden of proof.

The facts indicate that the only covenant not to compete involved in the present transaction was executed by Stanford and Norwood in the favored-price contract. Though petitioner, as the sole stockholder of Stanford, would benefit by this covenant, it is not entitled to an amortization deduction as it was not a party thereto. *Paul Herzog*, 2 B.T.A. 1139 (1925).

Petitioner's alternative assertion, the payment of a premium for the Stanford stock, is also not well founded. Petitioner contends that its poor financial position was caused by the provisions of the 80-percent contract. Therefore, it was forced to acquire control of Stanford so as to alter or amend this contract. Thus the payment of $185,820, argues petitioner, far exceeded the value of Stanford's assets and was in reality a payment for the contract. Petitioner at-

tempts to bolster this position by pointing to Stanford's balance sheet which valued its assets at $52,033.97.

The contract of sale entered into between petitioner and Koors and Brandle contained no provisions pertaining to the payment of a premium. As noted in *Ullman* and *Danielson*, a party to a contract is controlled by the terms of that contract unless he can demonstrate otherwise. Cole, the president of petitioner, was unaware of any arrangement whereby a premium was to be paid for the stock in question, and he did not authorize nor could he explain the reason for the amortization deduction. In addition we must point out that the balance sheet figure noted above was made up of certain accounts receivable, cash, inventory, and a patent. However, omitted from this figure was the value of the 80-percent contract and the corporation's goodwill. Further, the facts indicate that in arriving at a sale price, Koor and Brandle valued the income *to be produced* from its assets. In so doing, they arrived at a figure of $100,000 for the 80-percent contract. It seems illogical, if not inconceivable, to determine the payment of premium when the value established for the contract was done so by the sellers without discussion with the buyer. Therefore the existence of a premium has not been demonstrated either by a statement within the contract or by virtue of an agreed valuation of the underlying assets. *Howard Construction, Inc.*, 43 T.C. 343 (1964).

We are, of course, aware of the decision in *Kimbell-Diamond Milling Co.*, 14 T.C. 74 (1950), affirmed per curiam, 187 F. 2d 718 (C.A. 5, 1951), which held that the motives of a party entering into a transaction may be a significant factor in determining the realities of that transaction. However, it must be observed that the question of the intent of the parties became an issue in that case by reason of the liquidation of a subsidiary immediately following the acquisition of its stock. The present facts disclose no such liquidation. See also *Commissioner* v. *Seaboard Finance Co.*, 367 F. 2d 646 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court; *Howard Construction, Inc.*, *supra* at 357, fn. 4. However, even if we were to look to the party's intent in determining the reality of the transaction without concerning ourselves with a subsequent liquidation, petitioner on the facts presented has failed to demonstrate such a premium payment.

We also note in passing that even if a premium is determined to exist, petitioner has failed to demonstrate the useful life of the intangible asset. The 80-percent contract was subject to termination "on written agreement of the parties." Clearly, this does not provide a specific amortizable life. Petitioner's assertion that the "addendum memorandum agreement" provided a useful life of 10 years is clearly inappropriate. This contract was entered into between Stanford and

petitioner after petitioner had acquired control of Stanford. Therefore, it is apparent that even if a premium were paid to afford petitioner control of the 80-percent contract, the contract had no determinable useful life over which the ostensible premium could be amortized. *Toledo TV Cable Co.*, 55 T.C. 1107 (1971), on appeal (C.A. 9, Aug. 12, 1971); *W. K. Co.*, 56 T.C. 434 (1971).

Upon an examination of the entire record we must conclude that neither a covenant not to compete nor a premium was intended in the instant transaction, and therefore petitioner is not entitled to an amortization deduction.

*Decision will be entered for the respondent.*