INTERNATIONAL STATE BANK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9343–74.     Filed May 8, 1978.

*Paul A. Kastler*, for the petitioner.
*Fredrick B. Strothman*, for the respondent.

FAY, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
|------|------------|
| 1970 | $2,832.81 |
| 1971 | 8,496.20 |

Due to concessions, the sole issue remaining is whether the basis of certain assets received by petitioner upon the liquidation of its wholly owned subsidiary should be computed by reference

to the subsidiary's basis in such assets pursuant to section 334(b)(1),[1] or by reference to petitioner's adjusted basis in the stock of the subsidiary.

### FINDINGS OF FACT

Most of the facts in this case have been stipulated and are so found.

Petitioner International State Bank (hereinafter referred to as petitioner or the Bank) is a New Mexico banking corporation with offices in Raton and Cimarron, N. Mex. It is a member of the Federal Reserve System and has been in existence since 1918. Petitioner filed its Federal corporate income tax returns for the calendar years in issue with the Internal Revenue Service Center at Austin, Tex.

At all times relevant herein, the stock of petitioner (40,000 shares of common stock) was owned as follows:

| Shareholders | Number of shares | Percentage |
|---|---|---|
| Di Lisio Family[2] | 26,940.25 | 67.35 |
| Enterprises | 4,473.50 | 11.18 |
| Industries | 1,763.00 | 4.41 |
| Others | 6,823.25 | 17.06 |
| Total | 40,000.00 | 100.00 |

Di Lisio Industries, Inc. (Industries), and Di Lisio Enterprises, Inc. (Enterprises), are New Mexico corporations, each having one class of stock. The Di Lisio family owned all of the outstanding stock of Industries and Enterprises during the years in issue.

Swastika Hotel Corp. (Swastika) was organized in Raton, N. Mex. in 1928. Swastika's assets consisted primarily of a six-story hotel structure erected in 1929 and three parcels of land located in Raton. The hotel building, a brick structure, was the largest building in Raton. In 1968 the hotel was permanently closed because it could not be operated profitably. On February 10, 1970, Industries owned all of the outstanding stock of Swastika.

Prior to 1970 and the transaction in issue, the Bank occupied

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended and in force during the years in issue, unless otherwise indicated.

[2] The Di Lisio family consisted of Joe Di Lisio, Sr., his sons, and grandchildren.

one floor and a portion of the basement of a building located in the downtown area of Raton, N. Mex. During the period of time the Bank had occupied these premises, its gross assets had grown from $288,220.76 to $14,215,891.08, and the work force from 4 persons to approximately 35. It was the desire of the board of directors of the Bank to acquire larger facilities for the use of the Bank within the approximate 4-block area which comprised downtown Raton. There were limited buildings and space available in that area, and the Bank was under external pressure from the Federal Reserve and the New Mexico State Bank Examiner, in addition to its internal growth problems, to move to more adequate and safer premises. In late 1969 and early 1970 the board of directors discussed the advisability of the Bank acquiring the hotel structure owned by Swastika to fulfill its need for new facilities.

On January 10, 1970, following consultation with counsel, the parties involved agreed that petitioner would acquire the stock of Swastika from Industries and liquidate Swastika immediately thereafter. Pursuant to the prearranged plan, an agreement was entered into on February 10, 1970, between Industries as seller and the Bank as buyer, whereby the Bank agreed to purchase 100 percent of the stock of Swastika for $180,864.07. The purchase price would be paid by the Bank issuing 7-percent convertible debentures in the amount of $180,000 and paying the balance in cash.[3]

During the period January 10, 1970, to February 23, 1970, the Bank, Industries, and Swastika each conducted meetings of their respective directors and shareholders and passed the necessary resolutions consummating the sale of the Swastika stock and the adoption of a plan of liquidation by Swastika. By reason of the acquisition by the Bank of 100 percent of its stock, Swastika became a wholly owned subsidiary of the Bank. At all times before the stock acquisition, the Bank intended to liquidate Swastika and, immediately after such acquisition, Swastika conveyed its real property to the Bank by warranty deed, pursuant to its plan of liquidation.

After the liquidation of Swastika, the Bank allocated the purchase price of the stock to the tangible assets acquired in

---

[3]The debentures issued by the Bank to Industries were converted into common stock of the Bank through the exercise of the conversion privilege by Industries in 1971.

determining its basis in such assets for depreciation purposes. The adjusted basis of the hotel building carried by Swastika on its books at the time the building was received by the Bank was $32,051.11.

Upon audit of the Bank's income tax returns for the years in issue, respondent disallowed a portion of the depreciation deductions claimed by petitioner based on his determination that petitioner's basis in the hotel building upon the liquidation of Swastika was the same amount as it was in the hands of Swastika ($32,051), and not the stepped-up basis of $180,000 reported by petitioner on its returns.[4]

## OPINION

The issue presented concerns the basis of assets received by petitioner upon the liquidation of its wholly owned subsidiary.

Section 332 provides that under certain conditions, no gain or loss is generally recognized by a corporation upon the complete liquidation of its subsidiary. The statutory provisions with respect to the basis of assets received in a distribution to which section 332 applies are contained in section 334(b).[5] Section

---

[4]The record does not indicate why petitioner, on its returns, allocated $180,000 to the hotel building, leaving only $864.07 to allocate among the parcels of land it received upon the liquidation of Swastika.

[5]SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(b) LIQUIDATION OF SUBSIDIARY.—

(1) IN GENERAL.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), then, except as provided in paragraph (2), the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor. If property is received by a corporation in a transfer to which section 332(c) applies, and if paragraph (2) of this subsection does not apply, then the basis of the property in the hands of the transferee shall be the same as it would be in the hands of the transferor.

(2) EXCEPTION.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and

(B) the stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a 12-month period beginning with the earlier of—

(i) the date of the first acquisition by purchase of such stock, or

(ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary, proper adjustment in

334(b)(1) provides the general rule that the basis of assets received by the distributee-parent corporation, upon liquidation of its subsidiary under section 332, is the basis such assets had in the hands of the transferor-subsidiary. This is commonly referred to as a carryover basis. An exception to this general rule is contained in section 334(b)(2) which provides that if certain conditions are met, the basis of the assets received by the parent-distributee corporation is an amount equal to the parent's adjusted basis in the stock of the subsidiary. This is sometimes referred to as a cost basis. In order to qualify for cost treatment under section 334(b)(2), however, the parent must have acquired its stock in the subsidiary by "purchase." If there is no "purchase," the exception provided by section 334(b)(2) is inapplicable. The word "purchase" as used in section 334(b)(2) is a term of art, defined by section 334(b)(3) as any acquisition of stock, which meets certain enumerated requirements. One of those requirements is that:

the stock is not acquired from a person the ownership of whose stock would, under section 318(a), be attributed to the person acquiring such stock. [Section 334(b)(3)(C).]

In other words, if through the application of the attribution rules of section 318(a), the Bank constructively owned the Swastika stock at the time of its acquisition in 1970, the stock was not acquired by purchase. *Bijou Park Properties, Inc. v. Commissioner*, 47 T.C. 207 (1966). Petitioner, on brief, appears to have conceded the absence of a "purchase" and we so hold.[6] Accordingly, section 334(b)(2) is inapplicable in determining petitioner's basis in the property received by it.

It is petitioner's position, however, that because its sole purpose in acquiring the Swastika stock was to obtain the assets of that corporation, the purchase of the stock and subsequent

the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

[6]Application of the attribution rules of sec. 318(a) is often difficult and circuitous. The present case is no exception. The parties have stipulated that the Di Lisio family owned 100 percent of the stock of Industries, and 67.35 percent of the Bank, and that Industries owned 100 percent of Swastika. Therefore, under such rules: (1) Joe Di Lisio constructively owned the stock actually owned by the Di Lisio family; sec. 318(a)(1)(A)(ii). (2) By virtue of (1) Joe Di Lisio constructively owned 100 percent of the stock of Industries and Swastika; secs. 318(a)(1)(A) and 318(a)(2)(C). (3) Since Joe Di Lisio owned more than 50 percent in value of the stock of the Bank, the Bank constructively owned 100 percent of Industries; sec. 318(a)(3)(C). Thus the Bank constructively owned all of the stock owned by Industries in Swastika. Sec. 318(a)(2)(C).

liquidation of Swastika were in substance a purchase by it of the assets of Swastika. Therefore, argues petitioner, section 332 and consequently section 334(b) do not apply and petitioner's basis in such assets is its cost under the decision of this Court in *Kimbell-Diamond Milling Co. v. Commissioner*, 14 T.C. 74 (1950), affd. per curiam 187 F.2d 718 (5th Cir. 1951), cert. denied 342 U.S. 827 (1951). The legal question thus raised is whether with respect to corporate taxpayers, the so-called *Kimbell-Diamond* doctrine has any present vitality in light of the enactment of section 334(b)(2). While we have previously referred to the doctrine on several occasions, the question presented is one of first impression in this Court. See, e.g., *Yoc Heating Corp. v. Commissioner*, 61 T.C. 168, 178 (1973); *Cabax Mills v. Commissioner*, 59 T.C. 401, 409 (1972); *Kansas Sand & Concrete, Inc. v. Commissioner*, 56 T.C. 522 (1971), affd. 462 F.2d 805 (10th Cir. 1972).

Under the 1939 Code, if a corporation received property upon the liquidation of its subsidiary, the basis of the property received would be the same as the subsidiary's basis (a carryover basis).[7] *Cabax Mills v. Commissioner, supra.* In this regard, the intent of the acquiring corporation in purchasing the stock of the corporation which was liquidated and the amount paid for such stock were irrelevant. One judicial exception to the applicability of this rule was set forth in *Kimbell-Diamond Milling Co. v. Commissioner, supra.* In that case, a corporate taxpayer, following the destruction of its milling plant by fire, purchased all of the stock in another corporation. The taxpayer's sole intention in purchasing such stock was to liquidate the other corporation and thereby acquire its assets. The stock purchase

---

[7]The relevant provisions of I.R.C. 1939 provide, in part, as follows:

SEC. 112(b). EXCHANGES SOLELY IN KIND.—

    (6) PROPERTY RECEIVED BY CORPORATION ON COMPLETE LIQUIDATION OF ANOTHER.—No gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation.

SEC. 113(a). BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

    (15) PROPERTY RECEIVED BY A CORPORATION ON COMPLETE LIQUIDATION OF ANOTHER.—If the property was received by a corporation upon a distribution in complete liquidation of another corporation within the meaning of section 112(b)(6), then the basis shall be the same as it would be in the hands of the transferor. The basis of property with respect to which election has been made in pursuance of the last sentence of section 113(a)(15) of the Revenue Act of 1936, as amended, shall in the hands of the corporation making such election, be the basis prescribed in the Revenue Act of 1934, as amended.

and subsequent liquidation of the other corporation occurred only a few days apart. The taxpayer in that case argued that because the stock purchase and liquidation met the requirements of the predecessor of section 332, its basis in the assets thus acquired should be determined under the predecessor of section 334(b)(1).[8]

We declined to apply the statute because, despite its form, the substance of the transaction was merely the purchase of the assets of the other corporation by the taxpayer. We therefore concluded that the taxpayer's basis in such assets was their cost. In reaching our conclusion, we focused upon the taxpayer's subjective intent in acquiring the stock of the target corporation.[9]

Subsequent to our decision, Congress, in 1954, enacted section 334(b)(2). This statute was intended to be a codification of the principles set forth in *Kimbell-Diamond. Cabax Mills v. Commissioner, supra;* see *Kansas Sand & Concrete, Inc. v. Commissioner, supra.* The question later arose, however, as to whether, in enacting section 334(b)(2), Congress merely sought to establish a safe harbour for corporate taxpayers who complied with the statute, or whether it intended to supplant the subjective intent test of *Kimbell-Diamond* with a series of objective tests.[10] If the latter proposition is true, section 334(b)(1) or (2) would apply to transactions meeting the objective requirements of section 332, irrespective of the subjective intent of the acquiring corporation.

In 1968 the Court of Claims in *American Potash & Chemical Corp. v. United States,* 399 F.2d 194 (Ct. Cl. 1968), held that the *Kimbell-Diamond* doctrine was not preempted by the enactment of section 334(b)(2). Subsequent to that decision, however, three Circuit Courts of Appeal have expressed an opinion to the contrary.

The Ninth Circuit in *Pacific Transport Co. v. Commissioner,* 483 F.2d 209 (9th Cir. 1973), cert. denied 415 U.S. 948 (1974), cited with approval an earlier District Court decision which stated that "Section 334(b)(2) was passed by Congress to eliminate a subjective intent test enunciated in *Kimbell-Dia-*

---

[8] See n. 7 *supra.*

[9] In so doing, we adopted the reasoning of *Commissioner v. Ashland Oil & R. Co.,* 99 F.2d 588 (6th Cir. 1938).

[10] Sec. 334(b)(2), however, does not always operate to the taxpayer's benefit. See *Kansas Sand & Concrete, Inc. v. Commissioner,* 56 T.C. 522 (1971), affd. 462 F.2d 805 (10th Cir. 1972). Nor does the statute apply to individual taxpayers. Sec. 332(b).

*mond Milling Co. v. Commissioner." Boise Cascade Corp. v. United States,* 288 F.Supp. 770, 774 (D. Idaho 1968), affd. per curiam 429 F.2d 426 (9th Cir. 1970).

While the Fifth Circuit in *Supreme Investment Corp. v. United States,* 468 F.2d 370, 377 (5th Cir. 1972), did not address the issue of preemption directly,[11] it did state that, "In codifying the *Kimbell-Diamond* rule Congress made a major change: it substituted a series of objective tests in place of a determination of the taxpayer's subjective intent to obtain corporate assets."

Finally, the Seventh Circuit in *Broadview Lumber Co. v. United States,* 561 F.2d 698, 711 (7th Cir. 1977), has joined the Ninth and Fifth Circuits in rejecting the position taken by the Court of Claims. In so doing, the court offered the following analysis of the issue:

We agree with the Court of Claims that section 334(b)(2) is not "elective", but we do not agree with its conclusion that the broader *Kimbell-Diamond* doctrine therefore still should apply to those cases where the standards of section 334(b)(2) have not been met. To so hold would render Congress' action meaningless. Under that rationale, a taxpayer could fall within the bounds of *Kimbell-Diamond* regardless of whether he had complied with section 334(b)(2), thereby making the precise qualifying standards of that section superfluous. * * *

While the question is not entirely free of doubt, we believe the better view is that Congress, by enacting section 334(b)(2), intended the statute to supplant the subjective intent test of *Kimbell-Diamond* with a series of objective tests. Thus, we agree with the conclusion reached by the Circuit Courts of Appeal that the *Kimbell-Diamond* doctrine has no present vitality with respect to the determination of the basis of property received by a corporation in a liquidation which meets the requirements of section 332.

First, it is clear that section 334(b)(2) applies to transactions meeting the objective criteria of that section and section 332, regardless of the subjective intent of the acquiring corporation. *Cabax Mills v. Commissioner,* 59 T.C. 401, 409 (1972); *Kansas Sand & Concrete, Inc. v. Commissioner,* 56 T.C. 522 (1971), affd. 462 F.2d 805 (10th Cir. 1972). Therefore, it would be incongruous to say that by enacting section 334(b)(2), Congress did not intend for section 334(b) to govern the basis of property received in a

---

[11]A recent decision by a District Court in that circuit has so held. *Chrome Plate, Inc. v. Commissioner,* 442 F.Supp. 1023 (D. Tex. 1977, 40 AFTR 2d 77–6122, 78–1 USTC par. 9104).

transaction which meets the objective requirements of section 332.

Secondly, it is equally clear that section 334(b)(2) was enacted and intended by Congress as an exception to the general rule of section 334(b)(1). Implicit in the creation of only one narrow exception to the general rule of section 334(b)(1) would seem to be the exclusion of other exceptions, including the broader *Kimbell-Diamond* doctrine. See sec. 1.334-1(b), Income Tax Regs.; cf. *Pollack v. Commissioner,* 69 T.C. 142, 147 (1977). This is reflected in the Senate report which states that section 334(b)(2) "accordingly provides that if property is received by a corporation in a distribution in complete liquidation of its subsidiary then, *provided the conditions of [sec. 334(b)(2)] are met,* the basis of the property in the hands of the distributee *shall be* the adjusted basis of the stock with respect to which the distribution was made." S. Rept. 1622, 83d Cong., 2d Sess. 257 (1954). (Emphasis added.)

Finally, to apply the *Kimbell-Diamond* doctrine where the requirements of section 334(b)(2) have not been met would render the standards of that section a mere "piece of advice that Congress has graciously made available for those corporations which wish to claim a cost-basis without having to subsequently demonstrate their subjective intent." *Chrome Plate, Inc. v. Commissioner,* 442 F. Supp. 1023 (D. Tex. 1977, 40 AFTR 2d 77-6122, 78-1 USTC par. 9104). This, we are unwilling to do.

Accordingly, we hold that under the facts of this case, the basis of the assets received by the Bank upon the liquidation of Swastika is determined under section 334(b)(1).

*Decision will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *J.,* concurring: Even prior to the enactment of section 334(b)(2), there was a question whether that doctrine applied in cases involving corporations under common control, although there is some indication that the rationale of these cases is rooted in the presence or absence of a subjective intent to acquire assets. See *Frederick Steel Co. v. Commissioner,* 42 T.C. 13, 23-24 (1964), revd. on another issue 375 F.2d 351 (6th Cir.

1967), and cases discussed thereat. See also *Casco Products Corp. v. Commissioner*, 49 T.C. 32, 36–37 (1967). Common control is present herein and thus it may well be that this case is not the proper vehicle for resolving the preemptive character of section 334(b)(2). However, I think it clear that, at least to the extent that the *Kimbell-Diamond* doctrine rests upon a foundation of subjective intent, it has been sapped of its vitality by that section of the Code. Nevertheless, I am not convinced that the doctrine should be considered as having totally lost its vitality in all situations. Where extraneous events beyond the control of the acquiring corporation preclude a finding of literal compliance with the provisions of section 334(b)(2) and a felicitous reading of that section to cover such situations is not possible, we should not be prevented from utilizing the flexibility which the *Kimbell-Diamond* doctrine affords.

SIMPSON and STERRETT, *JJ.*, agree with this concurring opinion.