NEW YORK FRUIT AUCTION CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3734–80.    Filed September 28, 1982.

---

*Michael A. Varet*, for the petitioner.
*Vincent R. Barrella*, for the respondent.

TANNENWALD, *Chief Judge*: Respondent determined deficiencies in petitioner's Federal income tax in the amounts of $27,007, $24,480, and $23,945 for the taxable years 1974, 1975, and 1976, respectively. The sole issue for our determination is whether petitioner is entitled to a stepped-up basis in its assets, equal to the price paid for petitioner's stock by Cayuga Corp.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner New York Fruit Auction Corp. is a corporation with offices located at Hunts Point Food Center, Bronx, N.Y. Prior to and during the years at issue, petitioner was engaged in the business of conducting daily produce auctions at the Hunts Point Terminal Market in Bronx, N.Y.

The majority of petitioner's shares was owned by DiGiorgio Corp. (DiGiorgio). Some time prior to January 1, 1972, DiGiorgio concluded that it wished to divest itself of its stock in petitioner. By letter agreement dated June 8, 1972, and executed by DiGiorgio on June 12, 1972, DiGiorgio and Monitor Petroleum Corp. (MPC) entered into an agreement whereby MPC was to acquire DiGiorgio's stock holdings in petitioner.

On July 12, 1972, Cayuga Corp. (Cayuga) was incorporated for the purpose of acquiring petitioner's stock. MPC formally assigned its rights under the June 8, 1972, letter agreement to Cayuga on July 27, 1972. Cayuga acquired all petitioner's stock owned by DiGiorgio, i.e., 31,413 shares of class A voting stock (80.27 percent of the outstanding shares) and 26,573

---

[1] In accordance with a joint motion of the parties, the issue of the valuation of petitioner's assets was severed from the issue of petitioner's entitlement to a step-up in basis. See Rule 141(b), Tax Court Rules of Practice and Procedure. If we find for respondent in this case, the valuation of petitioner's assets becomes a moot question.

shares of class B nonvoting stock (73.22 percent of the outstanding shares) on August 1, 1972.[2]

On September 29, 1972, C. Sub. Inc. (C. Sub.) was incorporated as a wholly owned subsidiary of Cayuga. Apparently for the purpose of eliminating petitioner's minority shareholders, C. Sub. was merged into petitioner on November 10, 1972, and, in accordance with the merger agreement, the minority shareholders were paid $45 per share for petitioner's stock. The merger became effective on November 10, 1972.

On August 9, 1973, Cayuga was merged into petitioner. The owners of petitioner after the merger were the former owners of Cayuga. Apparently, the merger took the form of a downstream merger on the advice of petitioner's counsel. The record disclosed no reason why an upstream merger would not have been feasible.[3]

## OPINION

The sole issue for our determination is whether petitioner is entitled to a cost-of-stock basis[4] in its assets. Apparently, Cayuga's only asset was the stock in petitioner. Therefore, the assets whose bases are at issue are those assets which were owned by petitioner, rather than Cayuga, prior to the merger. Respondent contends that there exists no authority which would permit petitioner to step up the basis of its assets. Petitioner argues that it is entitled to a step-up in basis: (1) Pursuant to section 334(b)(2);[5] or (2) because the series of interrelated transactions which took place "in substance constituted the purchase of [petitioner's] assets by Cayuga."

Generally, a corporation's basis in its assets is their historical cost. See sec. 1012. Unless the Code provides otherwise, petitioner's basis in its assets remains equal to the cost of those

---

[2]At no time pertinent herein were any of the shareholders of Cayuga shareholders of petitioner or otherwise related parties within the meaning of sec. 334(b)(3), I.R.C. 1954.

[3]Although, in general, petitioner was required to obtain New York City's consent prior to assigning its lease of the Hunt's Point Terminal Market, the lease could be assigned to petitioner's successor corporation resulting from a merger, consolidation, or reorganization without such consent.

[4]The cost-of-stock basis refers to the cost which Cayuga paid to purchase petitioner's stock.

[5]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

assets despite the fact that petitioner's stock has changed hands. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders par. 1.05, at 1–14 (4th ed. 1979).

We deal first with petitioner's argument that it is entitled under section 334(b)(2) to a cost-of-stock basis in its assets.[6] Section 334(b)(2) is applicable only to liquidations within the meaning of section 332(b). *Yoc Heating Corp. v. Commissioner,* 61 T.C. 168, 175 (1973). Section 332(b) requires a complete liquidation of a subsidiary into its parent, and such a liquida-

---

[6]Sec. 334(b)(2) provides in pertinent part:

(2) EXCEPTION.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted—

\* \* \* \* \* \* \*

(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a 12-month period beginning with the earlier of,

(i) the date of the first acquisition by purchase of such stock, or

(ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made,

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. \* \* \*

Sec. 332(b) provides in pertinent part:

SEC. 332(b). LIQUIDATIONS TO WHICH SECTION APPLIES.— \* \* \* a distribution shall be considered to be in complete liquidation only if—

(1) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends); and \* \* \*

(2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year; in such case the adoption by the shareholders of the resolution under which is authorized the distribution of all the assets of such corporation in complete cancellation or redemption of all its stock shall be considered an adoption of a plan of liquidation, even though no time for the completion of the transfer of the property is specified in such resolution; \* \* \*

\* \* \* A distribution otherwise constituting a distribution in complete liquidation within the meaning of this subsection shall not be considered as not constituting such a distribution merely because it does not constitute a distribution or liquidation within the meaning of the corporate law under which the distribution is made; \* \* \*

tion can be accomplished by a statutory merger. Sec. 1.332–2(d) and (e), Income Tax Regs.

The merger of Cayuga into petitioner did not result in the complete liquidation of *petitioner.* "A status of liquidation exists when the corporation ceases to be a going concern and its activities are merely for the purpose of winding up its affairs, paying its debts, and distributing any remaining balance to its shareholders." Sec. 1.332–2(c), Income Tax Regs. At least through the trial of this case, petitioner remained an active corporation and, thus, was not liquidated within the meaning of section 332(b). Assuming that petitioner is correct that the direction which the merger took (downstream) was the result of an error of counsel and that the downstream merger resulted in no "substantive difference and that no benefit or advantage was gained thereby" (but see note 9 *infra*), these factors do not relieve petitioner of compliance with the requirements of section 332(b).

Insofar as section 334(b)(2) is concerned, we are unwilling to ignore the form of the transaction deliberately chosen by the participants in preference to [any] form suggested by petitioner or other possible forms that come to mind. * * * Section 332(b), the statutory threshold to section 334(b)(2), has been construed to require strict compliance with its formal requirements. * * * Under the circumstances of this case, we see no reason why we should adopt a different approach. * * * [*Yoc Heating Corp. v. Commissioner*, 61 T.C. at 175–176. Citations omitted.]

See also *Matter of Chrome Plate, Inc. v. United States*, 614 F.2d 990, 996 (5th Cir. 1980).[7]

Having concluded that petitioner is not entitled to increase the basis of its assets pursuant to section 334(b)(2), we turn to petitioner's contention that it is entitled to the benefit of the *Kimbell-Diamond* doctrine, namely, that where stock of a corporation is acquired for the purpose of liquidating the corporation and obtaining its assets, we will disregard the intermediate steps of the transaction and treat it merely as a

---

[7]Since the sec. 332(b) requirement of a liquidation of the subsidiary has not been met, we need not address the argument put forth by respondent at trial that, because Cayuga's percentage of ownership of petitioner's stock exceeds 80 percent only because of the acquisition of petitioner's minority shares at the time of the merger of C. Sub. into petitioner, Cayuga did not acquire 80 percent of petitioner's stock by purchase. In this connection, see *Madison Square Garden Corp. v. Commissioner*, 58 T.C. 619, 625–626 (1972), affd. in part and revd. in part 500 F.2d 611 (2d Cir. 1974).

purchase of the corporation's assets. See *Kimbell-Diamond Milling Co. v. Commissioner*, 14 T.C. 74 (1950), affd. per curiam 187 F.2d 718 (5th Cir. 1951). See also *Griswold v. Commissioner*, 45 T.C. 463, 472 (1966), affd. 400 F.2d 427 (5th Cir. 1968).

In *International State Bank v. Commissioner*, 70 T.C. 173 (1978), we held that the *Kimbell-Diamond* doctrine no longer has vitality in respect of transactions meeting the requirements of section 332. See also *Matter of Chrome Plate, Inc. v. United States, supra.* Whatever the vitality of the *Kimbell-Diamond* doctrine in respect of transactions falling outside the purview of section 332,[8] we do not believe that the present case falls within the scope of that doctrine.

Petitioner argues at length that the record clearly shows that the persons who arranged the purchase of petitioner's stock by Cayuga intended from the outset to acquire the assets of petitioner and that we should give effect to that intention. We think the record is far from clear as to the existence of any such intention. In any event, such an intention is not in and of itself enough. For the *Kimbell-Diamond* doctrine to be applicable, *the purchaser must acquire the sought-after assets.* See *Mills Pharmaceuticals, Inc. v. Commissioner*, 57 T.C. 308, 314 (1971). This simply did not occur in this case.

Petitioner's plea that we should look through form to substance and ignore this critical fact is without merit. We have in several instances cut through form and opted for substance, even to the extent of resurrecting a corporation which was eliminated during what purported to be an (F) reorganization (*Casco Products Corp. v. Commissioner*, 49 T.C. 32 (1967)),[9] or, as in the several cases relied upon by petition-

---

[8]See, e.g., B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders par. 11.44, at 11–48 (4th ed. 1979), for the proposition that "the purchase of stock by an *individual* with an intent to liquidate the corporation in order to obtain its assets—a transaction outside of § 334(b)(2) because the purchaser is not a corporation—may be treated as a purchase of assets." (Emphasis added. Fn. ref. omitted.) See also concurring opinion of Tannenwald, J., in *International State Bank v. Commissioner*, 70 T.C. 173, 181 (1978).

[9]*Casco Products* illustrates the potential for tax benefits which might be available to petitioner—i.e., availability of future carrybacks—and undermines petitioner's contentions to the extent that they rest on the absence of any difference in tax benefits whether Cayuga was merged into petitioner or vice versa.

er,[10] applied the "integrated transaction" doctrine to determine the actual purchaser of assets. But such approaches do not permit us to supply an essential fact which is missing herein, namely, that petitioner did not acquire the assets in a transaction which justifies according them a stepped-up basis.

That the result for which petitioner contends might have been accomplished in another fashion (the merger or liquidation of petitioner into Cayuga) is beside the point. Petitioner cannot escape the form of the transaction which it utilized. Compare *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945), with *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950), and *Wall v. United States*, 164 F.2d 462 (4th Cir. 1947), with *Priester v. Commissioner*, 38 T.C. 316 (1962). See also *Waltham Netoco Theatres, Inc. v. Commissioner*, 49 T.C. 399, 404–405 (1968), affd. 401 F.2d 333 (1st Cir. 1968).

*Decision will be entered for the respondent.*

---

[10] *Yoc Heating Corp. v. Commissioner*, 61 T.C. 168 (1973); *Long Island Water Corp. v. Commissioner*, 36 T.C. 377 (1961); *Southwell Combing Co. v. Commissioner*, 30 T.C. 487 (1958); *Wire Fabrics Corp. v. Commissioner*, 16 T.C. 607 (1951).